Good morning, Your Honors. My name is Lester Brown, and I am counsel for the Plaintiff Appellant, the Abbey Company, LLC. I'll be arguing for Abbey. I'd like to reserve five minutes of my argument time for rebuttal, and I'll try to keep my eye on the clock here. I'd like to thank you for giving us this opportunity to appear before you. There are two main issues before this Court. First, whether this action belongs in federal court. And second, whether the District Court erred when it held that there was no damage to the channel, which provided the only marine ingress and egress to Abbey's property, and thus no coverage under ten different coverage grants in Lexington's all-risk policy. I'd like to begin with the second issue first, unless the panel would like me to do otherwise. I actually have a number of questions about the jurisdiction. The first being, why didn't you advise Judge Wilson on what had happened in Judge Walter's court? Why did we or did we not? Why didn't you? Well, Your Honors, first of all, Judge Wilson's decision came down on January 12th. Right. We had been told by a minute order on the 4th of January by the Court that our oral argument was reset for February 26th. We were under the impression that we had some time. When we received the order from Judge Walter's order, we were a bit surprised by that. We didn't have the time. We had basically a week later, Judge Wilson, sua sponte, issued his order. Decided to start our judgment when you were under the impression that you would have a chance to advise him at least orally in February at the oral argument. Exactly at the oral argument, Your Honor. May I go? Would you like to address the jurisdictional issue at this point, Your Honor, or should I go ahead with the substantive issue? Sure. Let's do the jurisdictional first. Well, the issue of whether Abbey's action belongs in federal court is properly before this Court. As this Court stated in California v. The United States, the Court has, quote, not only of its own jurisdiction, but also of the lower courts in a case under review, even if the parties are prepared to concede it. And without getting into the procedural detail, I think Your Honor has just addressed that, concerning how we brought Judge Walter's decision to the attention of the district court. We believe that Judge Walter's holding that Lexington is a citizen of California and therefore not diverse should be applied here. The only substantive argument raised by the district court and by Lexington against the application of Judge Walter's holding is that the facts concerning Lexington's presence in California may have changed. Unfortunately for Lexington, nothing in the record evidences that the facts have changed. Indeed, given the opportunity... You thought that when you filed the lawsuit that Lexington was a Massachusetts corporation. We read what it said in Bess, Your Honor. That's correct. I understand, counsel, that maybe not you personally, but that your law firm was representing Unical in the other litigation. Is that correct? That is correct, Your Honor. Did either party in that case, I know I'm going to refer to parties, what I really mean is the law firms, the two law firms involved here, which by great coincidence are identical, did either side urge this ruling on Judge Walter? No. They did not. So that was not something that you told him in one case while you were telling Judge Wilson something different in this case? Absolutely not, Your Honor. Do you think that Judge Walter's ruling is correct? We did not feel that it was correct at the time that we made our submissions. Judge Walter did additional research and we had to stand by that. Is Judge Walter's decision binding on other courts within the Central District of California? I believe that it is, Your Honor. Let's take this case out of the equation for just a minute. Yes. And suppose that Lexington gets sued tomorrow in the Central District of California. Now, is Judge Walter's decision binding on the court there? Well, Your Honor, I think under Tosco, the court would have to go through the same analysis that Judge Walter's went through. And if there was indeed a change in the factual basis for Judge Walter's decision, it would not be binding. However, if there is no change, I think it is. Is the notion now of the principal place of business under Section 1332 so flexible that suits filed on adjacent days, now we have to see whether there's been a change between yesterday and today in the number of policies that Lexington's writing in California to figure out where its principal place of business is? Well, Your Honor, I think you have to look at the gravamen or the real power or reason behind that section on jurisdiction. And that is, as Judge Walter stated, that it has to do with whether there needs to be federal protection. Yes, but that's not what 1332 says. It does, doesn't it? Well, Your Honor, for purposes of diversity citizenship, you're going to be a citizen of every state where you're incorporated, and then you get one other place, which is going to be where your principal place of business is. And that's going to be a fixed site. It can change. Corporations move their headquarters from one state to another. But if Judge Walter is correct, and if Judge Wilson is correct as to why he doesn't want to honor Judge Walter's decision, then we've got a possibility that every time Lexington gets sued in California, we've got to go and check its quarterly reports to find out how many policies it's writing in California. And if it writes a bunch, then it doesn't need protection, and it's a citizen of California. If it didn't write as many this year, then it's a citizen of Massachusetts. That seems like a terrible way to run diversity jurisdiction in this state. Well, Your Honor, under Tosco, I think that's what's required. I think that is the examination that needs to take place. I don't think you can simply accept the fact that if a company says under Tosco that its principal place of business is one location, but the fact shows something else, that you should defer to what the company says. Right. I think that what a corporation is issuing in a state is a very good measure of where its principal place of business is. Well, I think it's more than that. I think Judge Walter made it clear that he was also talking about the dozens, if not hundreds, of agents Lexington has in this state. If you go on that website, and I've been on it, but if you go on that website like Judge Walter did today, you will see that the Lexington website refers you to these agencies and says they are the individuals who will sell you their policies. So I believe that there is a tremendous factual background supporting his decision. But I do also believe that that type of factual examination would need to be done in each case. Let's talk a moment about the policy behind this. If you look at the restatement and some other cases, it appears that the plaintiff should be the one that has the burden of showing where the defendant is. The plaintiff should show where the defendant is headquartered or basically to establish diversity jurisdiction. Let me refer you to the Napper case, the Fifth Circuit case. Are you familiar with that one? You can refresh my recollection. Okay. Napper v. Anderson, Henley, Shields, Bradford, and Pritchard. It's 500 Fed Second 634. It's a 1974 case from the Fifth Circuit. And that case held that the burden is on the plaintiff to show a change in the citizenship in a diversity action one month after ruling in another action that they were not diverse. And you've got Dracos v. Hellenic Lines. Are you familiar with that one? Yes, sir. What's your position on that? That's a 12-year gap, but again, the burden was placed on the plaintiff. Isn't that a better way to establish and clarify 1332 in terms of who has the burden going forward to show that there is in fact diversity jurisdiction? Well, I think that is the way the court has handled it, and that is exactly what happened in the case before Judge Walter. UNICAL was asked to carry the burden. Lexington was asked to assist. Lexington then was issued an order to show cause so that it was then required to provide information, and it said it had no additional information that it would provide. I think that's an appropriate way to approach it. That was up to the court. The court made that decision. So you're saying that you think that the district judge in fact followed that rule, that in fact the plaintiff did bear the burden of showing diversity jurisdiction? I think he did. And then when he felt that there wasn't a sufficient enough showing, he then asked both parties. I gather your position is not necessarily that other courts are bound as a matter of stare decisis by Judge Walter's decision. You're saying Lexington's bound as a matter of collateral establishment. That's correct, Your Honor. That is our position in this case. That's right. If Your Honors would allow me, I'd like to turn to the coverage issues for a minute. Recognizing that the court is fully aware of the provisions of Lexington's all-risk policy at issue as a result of Abbey's briefs, I'd like to focus on two policy provisions. The first is the insuring agreement itself. And the second is the, quote, all risk of physical loss or damage to property provision. First, the insuring agreement states that the policy covers the interest of the insured in all real and personal property, including but not limited to property owned, used, leased or intended for use by the insured. That's very broad. In other words, it's the interest in any of those. Well, is the channel property used by your client? The general property used by our client, Your Honor, that's at issue here is the channel. That's right. That wasn't my question. Is the channel property used by, I don't think there's much argument that it's used. No, absolutely not. So the question is, is it property and was it damaged? Yes, Your Honor, and that's what I'm about to address. That's absolutely right. The issue here is the only way for the boats, and in this particular situation, the Catalina Ferry, to get from our slip to the ocean is through this constructed channel, which is a ditch that has been dug in the marina out through to the ocean. And you usually have pilots, I'm sure you've all experienced this, that have to take you through this pathway in this engineered and constructed structure to get out into the water. Now, it is made out of soil, but that is what we're talking about. And I have a few documents that I'd like to illustrate. But the first thing I want to say is that as Judge Wilson recognized, Abbey has not claimed that what we're talking about here is our riparian rights, because we are not talking about our right to the use of the water. We are talking about our right to the use of the channel, this constructed structure. So what I'd like to... And who owns the channel? The channel is actually owned, I think, by Long Beach, the City of Long Beach, Your Honor. So the channel itself is owned by the City of Long Beach? That's correct. And we have a lease with the City of Long Beach for the use of... Is there, like, title available to the channel? The channel is completely under the water, right? Yes, that's correct, Your Honor. How could Long Beach own a channel underwater? That, Your Honor, goes back into the history of California and how states were formed and who had the rights to various lands. It is actually land, Your Honor, that just happens to be underwater. This, if you go to the Bixby case, which we cite, you'll see that this entire area of Long Beach was really a delta, and what they had to do is really construct ways of turning it into a harbor. Because otherwise, it naturally would not be this way. It would not be able to take this kind of traffic. You refer to the channel as a structure. In your view, what makes it a structure is that somebody has dug it out? Yes, Your Honor, and that engineers, for example, the Army Corps of Engineers, explicitly makes plans to do this, does it, and it is to be kept clean and open so that ships of the type of the ferry, which have a very deep draft, can get through. I mean, there's a lot of dredging down here and there on rivers and harbors, and I don't know if they're structures or just bottoms of the sea that get dredged. Well, our position would be that it is a structure, and it's very much like the structure that is described in the, I'm sorry, Your Honor, as I'm trying to find the name of this case, Morrison-Knudson case. Yes, of course, that was actual concrete. That's correct, it was concrete, but it was the same issue. The issue was the structure in that case able to be used for its intended purpose, which was to allow things to flow through it. It could be damaged even though it itself wasn't. Exactly, it wasn't. In this case, this is what happened as a result of the storms. The debris entered into the constructed ditch, the channel, and then stopped our tenant from being able to come in and out of the dock and go to Catalina. And that took place, and it was not corrected for three months until the Army Corps actually went out and did some what's called side casting to get the material out. Our position would be that that is damage to the channel. It certainly is damage to our interest in the channel. We couldn't use it. We couldn't use it for its intended purpose, and it was caused by the storm. It appears that the court, if you read what Judge Wilson wrote, that the court seems to go awry when he says that he makes a certain assumption about the fact that we're talking about the body of water, not the structure under the water. For example, the court says, and this is at the opinion on page 18, ER 174, the court strains to see how the channel as a body of water was damaged by the presence of debris. We have never been talking about the channel as the body of water. And if we had been granted oral argument, Your Honors, we would have shown some of the demonstratives we have here, which we probably don't have time for, to be able to demonstrate what we're talking about. We're talking about the constructed, engineered structure that allows the ships that have long drafts, like our ferry, to go in and out. That was damaged by this debris. And until that was removed, we could not use our facility and, therefore, triggered the business interruptions sections of our policies and other sections. We reserve the position that other parts of our policy do not require this type of damage. But this is the main issue, I think, that the judge went wrong on. And I also believe that this is not the case. The West Coast case. It charges us, Your Honor. We actually have a lease with them for the whole marina. What about other boats coming into the harbor? Can smaller boats come in and use the channel? Yes, they can. I don't know what their specific arrangements are, but each of the different tenants of the harbor or of the marina have arrangements for use of those structures. Your Honor, I see that I want to reserve some of my time for rebuttal, so I appreciate your time. You're from Lexington. Thank you very much, Your Honors. My name is Fred Bennett. I'm with the firm of Quinn Emanuel and representing Lexington in connection with the jurisdictional aspect of the appeal. Ms. Conraza and I have decided to divide argument. I'll take the first 10 minutes. She'll take the last 10 on the subject of the summary judgment ruling. I would just like to make two points to the Court in connection with the points made by the appellant in its reply papers as elucidated and expanded on a little bit here in their oral argument. The first point that they raise in their reply brief is that subject matter jurisdiction can never be waived, and so it's proper for this Court to consider that. That, of course, is a true statement, but it must be taken and interpreted, in our view, in the context of Rule 60b-4 of the Federal Rules of Civil Procedure, which is the context in which this argument has been raised. The case law universally requires that anyone who seeks to do that, as the appellant has here, bears a very high burden of proof. They must show that the case, in terms of jurisdiction, a lack of jurisdiction, and I'm now quoting the Steelcase case that they cited in their reply brief, which involved a federal question jurisdiction. There, the Supreme Court said that the lack of jurisdiction must be so plain and glaring as to constitute a total one of jurisdiction, or a plain usurpation of power, so as to render the judgment void from its inception. There's similar language in the Jones case that we have cited, which says that a jurisdictional argument must be a total one. It must show that the case was legally insufficient from its inception. And the Kosher case, which we have also cited, says that there must be, under a motion to void the judgment, no arguable basis for jurisdiction. Here, what does the record show? Well, the record shows, and argued clearly, that there's not only an arguable, but a solid case for diversity jurisdiction existing with respect to Abbey and Lexington. I take it that Lexington is not happy with Judge Walter's order? We were not happy with Judge Walter's order when it came down. And you argued against the position that he took? We did. Even though that seemed to cut against your client in the Unical case, you still wanted to maintain that Lexington is a Massachusetts corporation, not a California corporation? Absolutely. And, Your Honor, getting back to the record here, I'll get to Judge Walter's Unical decision in just a moment. The factors here which show an arguable, in fact, we think a solid case for jurisdiction are, first of all, Abbey has alleged, as the Court has pointed out, from the beginning up to the very moment that it filed this motion, that diversity jurisdiction existed in this case. The record itself has some facts that establish that. Number one, the record shows that, undisputedly, that Lexington's principal, Lexington's corporate headquarters, are in Massachusetts. Number two, that its assets, in terms of premiums, are all located in Massachusetts. Number three, that it has no employees and no assets whatsoever in California. And number four, even if it is considered, one goes back to 2005 and looks at Lexington's premiums collected in California, during that period of time, the record here shows that those premiums demonstrate that there is no substantial predominance of activity in any state, California or any other state. Only 16% of those premiums are collected in California, 9% in New York, 9% in Florida. And I would point the Court out, as we have, to the Arlano case, which came out in 2005. Which contains very similar figures with respect to the diversity jurisdiction issue as involved Arlano and Home Depot. Counsel, put aside to one side the problem that we face in this case. What problems will Lexington face in other cases filed in the Central District of California? We have a suit filed tomorrow against Lexington in the Central District. What's going to happen? What's going to happen, Your Honor, is that the analysis will have to be performed again. The question is, what is the situation? The whole question of Lexington's principal place of business is a moving target, depending on the day that it gets filed? I'm afraid it is. And is that required under our law? Yes, I believe it. There's no question that, and the parties don't dispute this, that diversity must be decided as of the date an action is filed. Now, in your hypothetical, we're talking about an action filed on day one, another action filed on day two. You know, it seems like it's not going to be very difficult to come up with something similar in terms of a showing on diversity. But when you're facing another kind of situation, like our situation, where you have an action filed in March of 2005, that's the UNICAL action, and you have our action filed 18 months later, there could indeed be a very different set of circumstances that would determine or be relevant to determining diversity jurisdiction. So Judge Walter's decision is not going to be binding on any other court within the Central District of California, but it is going to sort of stir the waters and force courts to examine the question of principal place of business every time the lawsuit gets filed. Well, I think the burden comes down, as one of the justices indicated, to the plaintiff. The plaintiff has a burden, and the burden with respect to diversity jurisdiction and establishing that there's a collateral estoppel effect, if that's the route the plaintiff wants to take, is the plaintiff has to show that on day one, and on the date in this case where Judge Walter decided there were facts that showed a lack of diversity jurisdiction, way back in March of 2005, that those same facts apply up here in September 2006. It's his burden. The way it's going to come up, of course, is that Lexington will be sued in state court, and they'll remove it. And then the issue is, was it properly removed? And I imagine the burden of going forward may be Lexington. I think that's a fair point. It well may be. But even in that kind of situation, the party must show that whatever ruling was made by whatever judge back here three years ago, one year ago, even one day ago, as inconvenient, absurd as that might sound on its face, that that still applies to the date of filing of a new lawsuit. A lot of things happen in the corporate world. Offices change, corporations change the nature of their businesses. That all has to be taken into account in connection with the determination of a diversity issue. That's why the case law says you go to the date the case is filed, and that's what you have to look at. What has happened here is that the plaintiff has not borne that burden. It's pointed to what something Judge Walter ruled way back in March of 2005, but has not shown or proven that those facts now can be transferred and now applied in September of 2006. There's no attempt to do that. There's simply a suggestion that Judge Walter was talking about things back then which must be true now. In the complaint in this case, presumably they alleged both the state of incorporation and the principal place of business were Massachusetts, was that the plaintiff's allegation? That's correct. And your answer is to admit? We admit it. And then the case goes through judgment. Yes. So the first attack on that is after judgment. You did not take an appeal in the Walter case, in the UNICAL case? We did not take an appeal. I understand it looks a little funny on the other hand. You're now subject to UNICAL suit in state court. Could you have taken an appeal? I believe we could have taken an appeal. Did you file a motion for reconsideration or anything like that? I don't believe that there was a motion filed there. I was not involved, but I think the case was litigated for a while in state court and I'm not sure what the ultimate disposition of that case was. There's one other point I wish to bring the Court's attention to in my last 30 seconds and this was also on the collateral estoppel point and on the plaintiff's burden here. There is authority that I think we both agree with from the Supreme Court, U.S. Supreme Court, the Park Lane-Hosry case. It says that when, as in this case, Abby's trying to use a collateral estoppel offensively, it has to be fair, it has to be a fair use. And one of the key elements is whether there's any other ruling out there which is inconsistent with Judge Walter's ruling. They say there isn't, but what they have forgotten is a case that we cited to the Court, the case of Merritt Island, which I think is worth pointing out, was raised in exactly the same context as Judge Walter's ruling. In that case, which was in the Federal District Court in California, Judge Klausner, in March of 2003, issued an order to show cause, just like Judge Walter did here, to the parties, as to why the case shouldn't be remanded to state court for lack of diversity. The parties came in, Lexington was one of those parties, and it was made a showing of the various facts that were relevant under the Tosco and the industrial tectonics case. Judge Klausner, so it was a heavily litigated issue, Judge Klausner reached a directly opposite conclusion to what Judge Walter reached. This is Merritt Island, right? This is in 2003. And so we have an interesting question of why didn't Judge Walter do the same thing that Abby's now asking this Court to do? Why didn't he say, well, I'm bound by the decision that my colleague made three years ago? And, again, that's just a, we say, a fatal flaw to this argument that there's some type of a collateral estoppel impact to this jurisdictional issue by virtue of what Judge Walter has ruled. Thank you, Your Honor. Good morning, Your Honors. Melinda Colross on behalf of Lexington. I'm going to be addressing the coverage issues this morning. As Abby's presentation made clear, the real central issue in this case as far as coverage is concerned and the provisions relied upon by Abby, the policy expressly requires physical damage in both the declarations and the perils insured against provisions, which both reference risk of direct physical loss or damage to covered property. That essential element is missing here. There is no physical damage to property covered under the policy. And that is true whether one looks at the bottom of the channel, the submerged land that Abby is focusing on, or one looks at the water that is in the channel, which is actually what is used to determine navigability. Because if you, you know, common sense look at this, it's the depth of the water that determines which boats can float through the channel or not. The records show that the bottom of the ship touched the bottom, and that's why there was a concern about being able to navigate there and run aground? Yes, one of Catalina Express's vessels touched the bottom of the channel, and they said, well, you know, we can't navigate, and they temporarily relocated. Is your position that that was not a physical damage? It's not physical damage to... Well, certainly physical. The contact was physical of the boat touching the bottom, but we're not looking at whether the boat was damaged. We're looking at here, was there damage to this property that Abby alleges an interest in, which is either the channel bottom or it's the water. And there is no physical damage. The fact that a certain size boat cannot travel is not damage to the bottom of the channel, and it's not damage to the water in the channel. And that's why there simply is no coverage here. The case relied upon the Morrison-Knudsen case, which is the primary authority cited by Abby, did not, the insuring agreement in that case only required damage. It didn't require physical damage. And what the court in that case said is, you know what, this concrete siphon culvert is not physically damaged in its structure. What it found is it couldn't carry water, which is what it was constructed to do, and they said, well, that's damage. That's damage in a loss-of-use context. The Safeco case that Abby also relies upon, the definition of property damage in that case said physical damage, destruction, or loss of use. If our policy here just said loss of use was enough, I think we would have a different coverage outcome. But it doesn't say loss of use. It says physical damage, and I submit to the court there's no physical damage here. Sediment on the bottom of the channel was a natural ongoing occurrence. Abby recognized that in its lease with the city, in the dredging agreement, in its lease with Catalina Express. They all said, you know what, sediment is going to come down the Los Angeles River, it's going to gather on the bottom of the channel, it's going to have to be dredged out to ensure navigability. City, you're required to do that. Abby, we're going to pay you 30 percent of our parking lot revenues for you to perform that dredging maintenance work. The city didn't do it, too much accumulated, and guess what, navigability was impaired. But that's not physical damage to the channel bottom or the water in the channel. Does the record indicate whether there's talk of debris? Was it just silt in there, or was there just a lot of junk? It just says silt and debris accumulated at the bottom. And we don't know what, there's no specification, there was a log or something, it just says silt and debris. Silt and debris was the subject matter of all those contractual agreements, the maintenance obligation that was imposed on the city, the lawsuit that Abby brought against the city saying you've breached your dredging obligation, we're not going to pay you the rent, which is our fee for your maintenance agreement, which was subsequently settled. We don't know what that was settled for. If you turn to a case that I think is most on point that Abby ignores that's cited in our brief, well, there's two. The West Waterway case says that an impairment to navigability in a public waterway is not damage to tangible property. There's no physical injury because your right of navigability is intangible. But that case also left open the possibility of property damage because the accident resulted in loss of use of the waterway, didn't it? It did, but we have the answer, again, dependent on our specific policy language. The Pentair v. American Guarantee case, which is an Eighth Circuit case from 2005, cited at page 56 of our brief. And you'll recall the Morrison-Knudsen case is an Eighth Circuit case from back in the 1940s. The identical policy language from Lexington's policy was at issue in the Pentair case. It required direct physical loss or damage to property described therein. And the insured in that case said that a supplier's factory was rendered inoperable because of a power outage. And they said... It's not physical damage to the bottom of the channel and it's not physical damage to the water and it's not physical damage to any navigation rights. Let's say hypothetically that there was a very large rainstorm and there was an extraordinary amount of silt that came in to the point that there was only a depth of, say, two or three feet in the whole channel. Nobody could use it except little flat-bottomed top boats. Would it be Lexington's position that that also did not constitute damage? It's not physical damage. We could have had a big drought and the whole channel dried up. There's no water in there at all. Has the channel been physically damaged by evaporation of water? The answer is no. What would constitute physical damage under your policy of this particular channel? Give me an illustration of what would constitute physical damage. Physical damage... Let's say there was a large earthquake and the whole channel caved in. It's now a 3,000-foot pit. That might qualify. Now, here, earthquake happens to be excluded under the policy, but assuming it wasn't... That's excluded in action or would be excluded. Yes, but that type of scenario might be damage to the channel because there's no longer a channel there. You've got this 3,000-foot pit. Other than that, there's really nothing that can happen to this channel that you would be responsible for. You're really talking about damage to structures and marinas and things like that. That's what's really covered under this policy. Exactly, unless there were some unusual circumstance like that hypothetical and earthquakes weren't excluded. And with that, if there are no further questions, we rest on our briefs and ask... Just to be sure, I understand your position as well. I gather you're not disputing that they can have... They don't have to have a legal interest in the property there in order to have an insurable interest here, right? We're willing to concede that their use of the channel gives them an interest, so they can move past that hurdle, but they can't get past the physical damage hurdle. Mr. Browning, you have just under four minutes. Yes, Your Honor. First, I would like to address the point that was just made by counsel for Lexington. Part of the problem that we've had in this case is that the words physical damage do not appear anywhere in their policy. This was repeated again and again by Lexington. It's been repeated again here at the oral argument, and it was repeated by the judge. The actual section says the following. What section are you referring to? This is paragraph 9 in the policy. You can find it at ER 41. It says this policy ensures against all risk of physical loss or damage to property described herein. Or... Does the physical attach to the word damage there? No, it doesn't. Why not? Because if you read insurance policies generally, Your Honor, you'll find that repetition is essential. And if they wanted it to say physical damage, they could have, but they did not. It simply says physical loss or. If they hadn't put the or in, there might be an argument there. Or clearly. In the coverage section, I'm quoting from the red brief. It says the interest is ensured in all real personal property in the event of loss or damage. Yes, loss or damage. I didn't see a physical in there. That's correct, Your Honor. It isn't in there either. As a matter of fact, it's not anywhere in the policy is what I'm saying. Now, I'm not saying that we're not talking about a physical structure here that was damaged. But the issue of physical damage is a red herring, and it should not be. Counselor made the point that just the natural sedimentary flow that comes into the channel, that's just not covered by the policy. Does that agree with that? Well, yes and no. Because first of all, there are no facts in the record that supports that that's what happened here. Okay, well, I guess what I'm looking for is at what point, if the normal day-to-day silt doesn't count, what does? What was the precipitating event here, if any, that would bring coverage, if she's correct, on how the natural, normal approach doesn't get covered? The precipitating event here were the storms in January. That is exactly why we made this claim. And the evidence that shows that the natural silting is not the cause here, which they did not prove factually in the case below, is the fact that the ferry worked on one day. After these huge storms, it could not get in and out the next day. And that deposit of material was due to the storms. And on an all-risk policy, if a storm and the damage that it caused is not covered, I don't know what is. And that's what this is, Your Honors. It's an all-risk policy. It's fine for Lexington to say that there are things that wouldn't be covered under this policy, but they had the opportunity to put in an exclusion and they did not. If I could turn to circumstances, the storm created an extraordinary amount of silt and debris. That's correct. The fact that the ship could pass the day before and couldn't the day after, from your perspective, was the proximate connection there. From your perspective, that is a loss. That's correct. Or there is damage to the channel as designed. Are you thinking of it as designed or as naturally laid out? No, as designed, Your Honor, as its intended use. And we had the right to use that channel. No one's arguing that we didn't have a right in that use of that channel. What does your lease say with the city of Long Beach? Does it promise anything in terms of the way it will be kept? Yes, it does. It requires them to dredge. Is there language that says that the city covenants that it will maintain a certain depth? Yes, it does. Is there something in the record that we could look at? Yes. I can get you the citation for that, Your Honor. You maybe sent us a 28J letter that refers to the part of the record that indicates the depth that the city of Long Beach was supposed to maintain. And our position would be, Your Honor, if the negligence of the city contributed to this, it's still covered. This is an all-risk policy. One point I just wanted to make about the, I'm sorry, the case that they rely on, the West Waterway case, is that that was a third-party liability case, Your Honor. It was not a first-party liability case. What the court held there was there was absolutely no showing of any loss or damage to a third party. That is not our case. This is a first-party case, and we have shown loss or damage. We certainly have lost significant amounts of money. On the jurisdictional issue, if I may, Your Honor, I know I'm a little bit over here. I think it was a good point to make. Lexington did not appeal Judge Walter's ruling. The other thing is, is that the red herring with regard to Judge Klausner's ruling is surprising to me, because Lexington never made that decision available to Judge Wilson, I mean to Judge Walter. It showed up for the first time in this case. They were asked, and in order to show cause to provide the information, they were asked, not just the plaintiff. They never brought that to Judge Walter's attention. And if you read that case, Your Honor, it's simply a minute order on a transfer of the case to federal court. It's one line, and the clerk simply discharged the order to show cause when the material was submitted by, I believe it was Lexington. There was no opinion. There was no decision. There was no research, as far as we can tell from the record. Thank you, Your Honors. Thank you.
judges: Canby, Bybee, Smith